**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

KENNETH DUEHRING,

        *Plaintiff*,

*v.*

COMMISSIONER OF
SOCIAL SECURITY,

        *Defendant*.

_____/

CASE NO. 2:18-12255

DISTRICT JUDGE NANCY G. EDMUNDS

MAGISTRATE JUDGE PATRICIA T. MORRIS

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT
(R. 19, 23)

## I.  RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (R. 19), be **DENIED**, the Commissioner's Motion for Summary Judgment, (R. 23), be **GRANTED**, and this case be **AFFIRMED**.

## II. REPORT

### A.  Introduction and Procedural History

This is an action for judicial review of a final decision by the Commissioner of Social Security denying Plaintiff Kenneth Duehring's claim for Disability Insurance Benefits (DIB) under Title II, 42 U.S.C. § 401 *et seq.* (R. 1). Pursuant to 28 U.S.C. §

636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge. (R. 4). Currently before the court are Plaintiff's and Defendant's cross-motions for summary judgment (R. 19, 23). Plaintiff has also filed a response to Defendant's motion. (R. 26).

Plaintiff filed applications for DIB and SSI in August 2011. (R. 16 at PageID.190-204). His claims were denied at the initial level on October 12, 2012. (*Id.* at PageID.116-17). An administrative hearing was held at Plaintiff's request on August 17, 2012. (*Id.* at PageID.83-114). Administrative Law Judge (ALJ) Kevin W. Fallis issued a decision finding that Plaintiff had not been under a disability from June 14, 2011, through the date of the decision, September 26, 2012. (*Id.* at PageID.66-82). The Appeals Council denied Plaintiff's request for review on January 28, 2014. (*Id.* at PageID.48-52). On March 28, 2014, Plaintiff filed a complaint in district court seeking reversal of the Commissioner's decision. *Duehring v. Comm'r of Soc. Sec.*, No. 4:14-cv-11275, 2016 WL 865844, at *1 (E.D. Mich. Mar. 7, 2016). On March 7, 2016, the court granted Plaintiff's motion for summary judgment and remanded the case because the ALJ failed to adequately explain the basis for his credibility determinations. *Id.*

While the appeal had been pending, Plaintiff had filed another claim for Title II benefits, which ALJ Michael Dunn had denied, after holding a hearing and adopting the RFC determination from the September 2012 decision. (R. 21 at PageID.685-98). Pursuant to the remand order, the Appeals Council vacated and remanded both cases, and directed ALJ Fallis to hold a new hearing and issue a new decision on the consolidated claims. (*Id.* at PageID.716-20). ALJ Fallis complied, and again found that Plaintiff had not been under

2

a disability from June 24, 2011, through the date of the decision, February 23, 2017. (*Id.* at PageID.631-49). This action followed. (R. 1).

### B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.*

### C.  Framework for Disability Determinations

Under the Social Security Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).   The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other

> work. If you can make an adjustment to other work, we will
> find that you are not disabled. If you cannot make an
> adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered him or her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

In the most recent ALJ decision, following the five-step sequential analysis, ALJ Fallis found Plaintiff had not been under a disability from the alleged onset date of June 14, 2011, through the date of the decision, February 23, 2017. (R. 21 at PageID.634-49). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant period. (*Id.* at PageID.636). Next, the ALJ determined Plaintiff had the

following severe impairments: degenerative disc disease of the cervical and lumbar spine, bilateral carpal tunnel syndrome (CTS), osteoarthritis, sciatica on the left, hypothyroidism, obstructive sleep apnea, obesity, major depressive disorder, panic disorder, and social anxiety disorder. (*Id.* at PageID.636-37). Plaintiff's hypertension was found non-severe. (*Id.* at PageID.637). And he did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (*Id.* at PageID.637-40).

Before proceeding further, the ALJ found Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except that he

> can lift up to 20 pounds occasionally and lift/carry up to 10 pounds frequently. The claimant can stand 3 hours, walk for 3 hours, and sit for up to 6 hours in an 8-hour workday, with normal breaks. The claimant can occasionally perform pushing or pulling. The claimant can occasionally operate foot controls. The claimant can never climb ladders, ropes, or scaffolds or crawl. The claimant can occasionally climb ramps or stairs, balance, stoop, kneel, or crouch. The claimant can occasionally perform overhead reaching. . . . [and] frequently perform bilateral handling of objects and fingering. The claimant can tolerate exposure to loud noise, such as heavy traffic. . . . [, but] needs to avoid all exposure to vibration and unprotected heights. The claimant needs to avoid even moderate use of hazardous moving machinery. The claimant requires work that is limited to simple, routine, and repetitive tasks performed in a work environment free of fast-paced production requirements and involving only simple, work-related decisions and routine workplace changes. The claimant cannot interact with the public. The claimant can tolerate only occasional and superficial interaction with coworkers.

(*Id.* at PageID.640).

At steps four and five, the ALJ concluded that Plaintiff was unable to perform his past relevant work as a design technician, but that jobs he could perform existed in significant numbers in the national economy—for example, office support clerk (172,000 jobs nationally); sorter (25,000 jobs); and bench assembler (80,000 jobs). (R. 21 at

PageID.647-49). Thus, the ALJ determined that Plaintiff had not been under a disability as defined in the Social Security Act during the relevant time. (*Id.* at PageID.649).

### E. Administrative Record

#### 1. Medical Evidence

I have thoroughly reviewed Plaintiff's medical record. In lieu of summarizing his medical history here, I will make reference and provide citations to the record as necessary in my discussion of the parties' arguments.

#### 2. Application Reports and Administrative Hearing

##### i. Plaintiff's Function Report

Plaintiff completed a function report on September 28, 2011. (R. 16 at PageID.44); (R. 16 at PageID.238). He explained that his ability to work was limited because he could not stand for more than 30 minutes at a time nor lift anything heavier than 30 pounds, and he was constantly in pain because his spine was "rubbing on nerves." (R. 16 at PageID.238). In a typical day, he did physical therapy exercises and then laid on the couch with a heating pad until his step-children came home from school. (*Id.* at PageID.239). He helped them with homework, fed them, and made sure they showered, then the family went to bed. (*Id.*). Plaintiff, though, could "hardly sleep" because of constant pain. (*Id.*). When his wife was not at work, she helped with laundry, dishes, and "everything I can't." (*Id.*). Plaintiff could vacuum about once a week and water the lawn about three times a week, although he needed help or encouragement for getting up to do those tasks. (*Id.* at PageID.240). Previously, Plaintiff had been able to walk "right," run, "feel good," lift heavy things, work, and leave the house more often. (*Id.* at PageID.239).

As for personal care, it hurt Plaintiff to bend and lift his arms above his head, so dressing, bathing, and caring for his hair caused pain, but he was able to shave and feed himself with no trouble. (*Id.*). He had bought handles to help him sit down on and rise from the toilet. (*Id.*). Plaintiff prepared his own meals: leftovers or frozen dinners, taking about half an hour to an hour. (*Id.* at PageID.240). Since onset, he was "not as quick in the kitchen." (*Id.*).

Plaintiff went outside about once a day, and could go out alone, drive, and ride in a car. (*Id.* at PageID.241). He shopped for groceries in person and for household items online. (*Id.*). He remained able to pay bills, count change, handle a savings account, and use a checkbook or money orders. (*Id.*).

For fun, Plaintiff read every night, and watched television during the day; he could no longer ride motorcycles and now found it hurt to sit "for long periods at a time." (*Id.* at PageID.242). Although Plaintiff did not "get out very often" because of his pain and medications, he went to doctor appointments at least once a week, and the grocery store once a month; he also went to church on a regular basis. (*Id.* at PageID.242-43). He had no trouble getting along with others, and got along "OK" with authority figures. (*Id.* at PageID.243-44).

Plaintiff's impairments affected his abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks. (*Id.* at PageID.243). By his estimate, he could walk 1/8th of a mile before needing to rest for 5 to 10 minutes. (*Id.*). He followed written and spoken instructions well, and he could pay attention "until I'm in too much pain to focus." (*Id.*). He did not finish what he started. (*Id.*). Stress he handled "OK"; changes in

routine "not great." (*Id.* at PageID.244). He was depressed "because I'm bored and broke and I'm afraid of losing everything due to lack of money." (*Id.*).

Plaintiff used a cane to get up and when standing; it had not been prescribed by a doctor. (*Id.*). Some of his medication caused side effects: Motrin caused stomach pains and headaches, his Vicodin made it hard to breathe, Ultram caused sweating and difficulty sleeping, Neurontin made him tired and dizzy, and Flexeril made him tired and drowsy. (*Id.* at PageID.245). Sometimes Plaintiff needed reminders because he would forget whether he had taken his medicine. (*Id.* at PageID.240).

### ii. The August 2012 Hearing

Plaintiff first filed for disability benefits in August 2011, seeking both DIB and SSI, alleging onset on June 14, 2011; his date last insured was March 31, 2013. (R. 16 at PageID.69). An administrative hearing was held on his claims on August 17, 2012, before ALJ Fallis. (R. 16 at PageID.83-114). Plaintiff was represented by attorney Aaron Lemmens. (*Id.* at PageID.86).

Plaintiff explained he was most troubled by his constant back and neck pain, which was usually at a 7, but several times a month flared up to a 10. (*Id.* at PageID.88). His condition had worsened in the past few months, and he now found it harder to get up. (*Id.* 89). He could do housework for about 15 or 20 minutes before needing a 10- or 15-minute break. (*Id.*). He had difficulty washing his legs in the shower. (*Id.* at PageID.100). Though he used to enjoy riding dirt bikes, fishing, or hunting, he could no longer do any of his hobbies. (*Id.* at PageID.89). He hadn't been to a movie in years, because he couldn't sit for long. (*Id.* at PageID.89-90). After sitting for about 20 minutes, his back and neck would

"tighten[] up." (*Id.* at PageID.90). He could walk to the mailbox—about 600 feet—with no issue. (*Id.*). Pain troubled his sleep, so he only slept two hours a night and did not nap during the day. (*Id.* at PageID.91, 100). And he had trouble bending over, squatting, and climbing stairs. (*Id.* at PageID.91). He could drive for 45 minutes to an hour before becoming uncomfortable. (*Id.*). In the past couple of years, Plaintiff had lost 90 pounds because his medications caused nausea, so he only ate once a day. (*Id.* at PageID.92-93). His medications also caused dizziness and a dry mouth, and possibly insomnia and memory issues. (*Id.* at PageID.96). He consumed medical marijuana about once a week for his pain and nausea. (*Id.* at PageID.103). And he smoked half a pack of cigarettes a day. (*Id.* at PageID.102).

In addition to his back and neck pain, Plaintiff suffered from carpal tunnel syndrome in both hands and knee pain. (*Id.* at PageID.97). He explained, "I ripped both my ACL's right in half, they're supposed to repair those, that was probably five years ago and I never did it. Kind of scared of surgeries." (*Id.*). Further, although he had not received a diagnosis of heart disease, his heart walls were thickening, he had an irregular heartbeat, and his "red blood count" was "really high." (*Id.* at PageID.97-98).

Plaintiff reported that Dr. Rhum had told him not to lift over 20 pounds; the ALJ confirmed with Plaintiff's counsel that nothing in the record indicated Dr. Rhum had set lifting limitations. (*Id.* at PageID.99).

### iii.  The September 2015 Hearing

While Plaintiff's appeal on his earlier claims was pending in federal court, he filed a new claim for DIB benefits. A hearing on that claim was held on September 16, 2015,

before ALJ Dunn. *See* (R. 21 at PageID.688). The transcript from that hearing does not appear in the record. I suggest the missing transcript does not require remand, because the record contains not only the ALJ's decision following that hearing, which summarizes Plaintiff's testimony, (R. 21 at PageID.688-98), but also Plaintiff's testimony at two other hearings, including the most recent hearing, (R. 16 at PageID.83-114); (R. 21 at PageID.448-98). Further, there is no indication in the briefing or record that the missing hearing testimony would be significantly different or otherwise affect the outcome of the case. *See Parker v. Comm'r of Soc. Sec.*, No. 17-12307, 2018 WL 5800920, at *2 (E.D. Mich. Nov. 6, 2018) (adopting R&R, over plaintiff's objection, where plaintiff did not show missing parts of hearing transcript prejudiced him, or identify any specific testimony missing from hearing transcript that would have helped his case). *Cf. Clarke v. Colvin*, No. 13-11534, 2014 WL 4605690, at *7 (E.D. Mich. Sept. 15, 2014) (remanding case due to absence of essentially any hearing testimony from claimant). I suggest, therefore, that the record is sufficient for the court to conduct a thorough review.

### iv.  The December 2016 Hearing

#### a.  Plaintiff's Testimony

The most recent administrative hearing in Plaintiff's case was held on December 6, 2016, before ALJ Fallis. (R. 21 at PageID.448-98). Plaintiff proceeded without a representative. (*Id.* at PageID.452). He was currently living at his parents' house with his wife and her two children; his children (ages 17, 18, and 26) visited every weekend. (*Id.* at PageID.457). He weighed 182 pounds, and explained he had lost 84 pounds in the past 5 years because he had no appetite. (*Id.* at PageID.458). He had a GED and had attended

11

some college courses in architecture. (*Id.* at PageID.459-60). Although he had been "really close" to earning his bachelor's, he had stopped attending classes in May 2011 because he "couldn't take the pain" caused by sitting in class. (*Id.*). Additionally, he had received training and certification in Computer-Aided Design. (*Id.* at PageID.460).

Plaintiff had his driver's license, and drove once or twice a week to doctor's appointments, at most a 25-minute drive, after which his legs were painful and numb. (*Id.* at PageID.458-59).

Plaintiff testified that he had had several worker's compensation claims, the first when he was 18 years old and his right hand was crushed in a machine, the second around 2006 when he put a nail through his left hand and the tendon needed to be repaired, and the third in 2009 when he broke his right thumb and it needed to be pinned. (*Id.* at PageID.461).

He had last worked in June 2011 at a factory job at ZF Lemforder. (*Id.* at PageID.462). He had stopped working because his back pain was so intense he could not get out of bed in the morning; he had gone to the emergency room, where an x-ray revealed a herniated disc in his back. (*Id.*).

Plaintiff provided the ALJ a list of his medications, which had some side effects. (*Id.* at PageID.464). His doctor had switched him off a diabetes medication that made him "black out" to a time released medication that still made him dizzy, but "not as bad." (*Id.*). Other medications caused nausea and "no sex drive" and made him feel "like a zombie." (*Id.* at PageID.464-65). His doctors were still working on adjusting his medications to

reduce the side effects; they were unsure which medication was causing his nausea but had given him Prilosec and Zantac to help. (*Id.* at PageID.465).

Back pain had troubled Plaintiff since around 2007. (*Id.* at PageID.466). Since his alleged onset month, June 2011, the pain had been constant, though the severity fluctuated. (*Id.*). The pain radiated into his lower extremities and was accompanied by numbness. (*Id.* at PageID.467). He rated his usual pain at about a 7, with spikes to 10 (with 10 "mean[ing] you're going to the emergency room") about thrice weekly. (*Id.* at PageID.466-67). The pain radiating down his right leg was "a ten for sure," while his right leg was a 6 or 7. (*Id.* at PageID.468). Sitting triggered a spike in pain. (*Id.* at PageID.467).

Further, Plaintiff had had daily neck pain since a car accident in 2006; he rated the neck pain at an 8 and migraines at a 10. (*Id.* at PageID.468-69). He could not turn his neck to look sideways when driving, and instead had to turn his whole body. (*Id.* at PageID.469). The migraines, which were getting "worse and worse," caused nausea and forced him to lie down. (*Id.*). He said they lasted at most an hour after he took Aleve, but also said the Aleve "doesn't really take it away." (*Id.*).

He explained that he had "pain all over," caused by arthritis and carpal tunnel "going down both my arms, both my legs, in my shoulders." (*Id.* at PageID.470). He woke up in pain from sleeping on his arms, thought he "must be pulling [his] tendons," and had a plantar wart on his left foot "that kills me." (*Id.*). He had worse pain in his right foot, which he was "pretty sure" he had broken when he was 19 years old, though "most of the time it's fine." (*Id.*).

In addition, Plaintiff had various heart issues: hypertension, "heart disease," and coronary artery disease, and his heart was "thickening to the where it's going to get too thick and stop." (*Id.* at PageID.471). Although in the past he had had frequent chest pains, his medication had reduced the frequency. (*Id.*). He used nitroglycerine spray when he felt symptoms, about four times a month. (*Id.*). Plaintiff had had his first heart attack at age 17, and had been seeing a cardiologist since. (*Id.* at PageID.471-72). Judging by the scar tissue, he said, he had had eight heart attacks. (*Id.* at PageID.472). Previously, he had not been able to tell when he had them, but now he could. (*Id.*). Plaintiff also said his pain and medications were taking a toll on him. (*Id.*).

Next, the ALJ moved on to Plaintiff's functional limitations. Plaintiff said he was not sure how long he could carry a gallon of milk. (*Id.* at PageID.473). He could usually sit about 40 minutes—the length of time the hearing had been in progress at that point— before needing to get up and move. (*Id.*). He could ease the pain while sitting if he "lean[ed] forward and kind of rock[ed his] legs." (*Id.*). He could stand for about 10 minutes before his legs gave out on him, and he could walk about half a mile, although after that his legs would be sore. (*Id.* at PageID.474-75). Plaintiff explained he did grocery shopping, but used the cart for help. (*Id.* ).

Plaintiff could prepare Poptarts and cereal, but his mother did all the cooking, he said, explaining, "I don't think she would let me cook." (*Id.* at PageID.475). He estimated he had gone shopping four or five times since June 2011, usually for about half an hour. (*Id.*). He took his step-children with him because he was scared to go places by himself. (*Id.* at PageID.475-76). He did not do dishes or laundry because he hated them; he thought

14

he had done laundry "maybe three times" in the past 5 years and 10 months. (*Id.* at PageD.476). When it came to other household chores, like vacuuming, sweeping, mopping, and dusting, and outdoor chores like mowing and shoveling snow, Plaintiff said, "I get the kids to do that for me." (*Id.*). When Plaintiff did do chores, he had to stop every 10 minutes or so and take a 15-minute break. (*Id.*). As for his personal hygiene, Plaintiff could take care of "my hair and my face and stuff," but his wife cut his hair and helped him "with my legs." (*Id.* at PageID.477-78). He had not shaved in "a while" and did not own any razors. (*Id.* at PageID.478).

Plaintiff explained that his sons were in a church program called "Royal Rangers," which was like the Boy Scouts. (*Id.*). He didn't attend their meetings, but went to their award ceremonies and the pinewood derbies. (*Id.* at PageID.478-79).

Turning to his mental impairments, Plaintiff testified that when his doctors had told Plaintiff he could no longer work, he "fell into a really bad depression," felt worthless, and had thoughts of suicide. (*Id.* at PageID.479). He took Pamelor and Cymbalta for his depression, prescribed by psychologist Dr. Terry White. (*Id.* at PageID.480). He had been seeing Dr. White for two or three years. (*Id.*). He had also suffered from panic and anxiety since he was 19 years old, and he thought "it had something to do with my heart issue." (*Id.*). Two years ago, his wife had convinced him to get a dog, which had been a "lifesaver." (*Id.* at PageID.479). He gave the dog water and often watched her play in the house or backyard, but his wife bathed her, his mother fed her, and she had already been trained when they got her. (*Id.* at PageID.480-81).

15

Each summer, Plaintiff took a trip to a cabin up north for about a week. (*Id.* at PageID.481-82). The house was on the beach, and he spent most of the day lying on the beach in the sun. (*Id.* at PageID.482).

Plaintiff explained that he had quit smoking since the last hearing, because a doctor had told him "either quit smoking or it isn't going to be long" until he died. (*Id.* at PageID.482). He thought he had not had alcohol in about a year. (*Id.* at PageID.483). He had his medical marijuana card, and took "a couple puffs" three or four times each day. (*Id.* at PageID.483-84).

Plaintiff had worked as a Computer-Aided Design operator/graphic designer/computer designer for about four years, from around 1989 to 1993. (*Id.* at PageID.488-89). He had had to lift over 20 pounds and help troubleshoot machines in the shop, as well designing them. (*Id.* at PageID.490). He had also worked at Creative Foam Corporation, "putting all the drawings in . . . 3-D for the shops to be able to put . . . the product together." (*Id.* at PageID.490-91). And he had worked a temporary job at a factory. (*Id.* at PageID.491).

### b. The Vocational Expert's Testimony at the December 2016 Hearing

Vocational Expert (VE) Judith Findora also testified. (*Id.* at PageID.486-96). The ALJ instructed the VE to assume that Plaintiff's position as a design technician was his only past relevant work. (*Id.* at PageID.491). The VE explained that Plaintiff's past work as a designer was skilled with an SVP of 5, and light exertion. (*Id.* at PageID.489). Though now most similar positions were sedentary, at the time Plaintiff had been working, "not

16

only did they do the design on a computer, but they also still were making actual models."

(*Id.* at PageID.489-90). Because the technology had changed since Plaintiff last worked,

he would have no transferable skills. (*Id.* at PageID.493).

The ALJ posed his first hypothetical:

[T]he individual would be limited to light work; however, they could stand for three hours, walk for three hours, and sit for up to six hours in an eight hour work day with normal breaks. This individual could occasionally perform pushing or pulling; they could occasionally operate foot controls; they could never climb ladders, ropes, or scaffolds; they can occasionally climb ramps or stairs; occasionally balance, stoop, kneel, and crouch; they could never crawl. They could perform occasional overhead reaching. They could perform frequent bilateral handling of objects and fingering. They could be exposed to loud noises such as heavy traffic. They would have to avoid even moderate use of hazardous moving machinery. They would have to avoid all exposure to unprotected heights.

(*Id.* at PageID.492). The hypothetical person could not do Plaintiff's past work, the VE

said, but could work as a cashier (250,000 jobs nationally); office support clerk (172,000

nationally); or sorter (25,000 nationally). (*Id.* at PageID.493).

For his second hypothetical, the ALJ asked the VE to add a limitation to "simple,

routine, repetitive tasks performed in a work environment free of fast-paced production

requirements [and] involving only simple work-related decisions and routine workplace

changes." (*Id.*). The same jobs would be available in the same numbers. (*Id.*).

The third hypothetical added limitations to no interaction with the public and only

occasional and superficial interaction with coworkers. (*Id.* at PageID.493-94). A person

with those limitations could not work as a cashier, but the office support clerk and sorter

positions would remain available in the same numbers. (*Id.* at PageID.494). In addition,

the position of bench assembler would be available (80,000 nationally). (*Id.*).

17

Next, for his fourth hypothetical, the ALJ inquired whether employment would be available if the person from the first hypothetical were limited to sedentary work. (*Id.*). The VE replied that such a person could work as an office support clerk (330,000 nationally); sorter (24,500 nationally); or packer (40,000 nationally). (*Id.* at PageID.494-95).

Moving on to the fifth hypothetical, the ALJ limited the hypothetical person to simple, routine, repetitive tasks performed in a work environment free of fast-paced production requirements, involving only simple work-related decisions and routine workplace changes. (*Id.* at PageID.495). The same jobs would be available in the same numbers. (*Id.*).

Sixth, the ALJ added limitations of no interaction with the public and only occasional, superficial interaction with coworkers. (*Id.*). The same jobs would remain available, the VE testified, but the number of office support clerk positions would be reduced to about 197,000 nationally. (*Id.*).

In the seventh and last hypothetical, the ALJ asked whether any work would be available for someone who would be absent from work two days per month due to doctor's visits, symptoms, and side effects of medications. (*Id.*). The VE explained that no work would be available, regardless of why the person was missing work. (*Id.* at PageID.495-96). To finish, the VE explained that the Dictionary of Occupational Titles did not cover her testimony about absenteeism, did not differentiate between reaching overhead and in other directions or "pushing and pulling as opposed to handling and fingering," and did not specifically speak to quotas, working with the public or coworkers, or "limiting the number

18

of standing and walking [*sic*].” (*Id.* at PageID.496). On those topics, the VE had spoken from her professional experience and research. (*Id.*).

### F.  Governing Law

The ALJ must “consider all evidence” in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: “acceptable medical sources” and “other sources.” 20 C.F.R. §§ 404.1513 (amended March 27, 2017), 416.913 (amended March 27, 2017).[1] “Acceptable medical sources” include, among others, licensed physicians and licensed or certified psychologists. *Id.* §§ 404.1513(a), 416.913(a). “Other sources” include medical sources who are not “acceptable” and almost any other individual able to provide relevant evidence. *Id.* §§ 404.1513(d), 416.913(d). Only “acceptable medical sources” can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions “about the nature and severity of an individual’s impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions.” *Id.* When acceptable medical sources issue such opinions, the regulations deem the statements to be “medical opinions” subject to a multi-factor test that weighs their value. 20 C.F.R. §§ 404.1527 (eff. Sept. 3, 2013 to Mar. 26, 2017), 416.927 (eff. Aug. 24, 2012 to Mar. 26, 2017). Excluded from the

---

[1] SSR 06-03p was rescinded effective March 27, 2017, and 20 C.F.R. § 404.1513 was updated as of March 27, 2017. The new regulation is effective for cases filed on or after March 27, 2017; because Plaintiff filed for DIB in 2011, I consider his case under the old rule.

definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* §§ 404.1527(d), 416.927(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. *Id.* §§ 404.1527(c) (eff. Sept. 3, 2013 to Mar. 26, 2017), 416.927(c) (eff. Aug. 24, 2012 to Mar. 26, 2017). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed his claim before March 27, 2017, he is entitled to the benefit of the treating-source rule. Under that rule, certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also* *Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. §§ 404.1527(d), 416.927(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

The claimant must provide evidence establishing his or her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

In accordance with SSR 16-3p, an ALJ must analyze the consistency of the claimant's statements with the other record evidence, considering his or her testimony about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in the Social Security Ruling. SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). This analysis and the conclusions drawn from it—formerly termed a credibility

determination—can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); 16-3p, 2016 WL 1119029, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071) (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). The absence of objective, confirming evidence obligates the ALJ to consider the following factors:

(i)      [D]aily activities;
(ii)      The location, duration, frequency, and intensity of . . . pain;
(iii)      Precipitating and aggravating factors;
(iv)      The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)      Treatment, other than medication, . . . received for relief of . . . pain;
(vi)      Any measure . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3), 416.929(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); 16-3p, 2016 WL 1119029, at *7.

### G. Analysis

Plaintiff is proceeding pro se. Although in his complaint, he marked that "[t]he Commissioner's decision was based on legal error," (R. 1 at PageID.4), neither his complaint nor his motion for summary judgment clearly lays out what legal errors he believes the ALJ committed. Rather, both summarize his many alleged medical issues, including: herniated discs in his back; degenerative disc disease; pinched nerves; severe arthritis in his neck and back; numbness in both legs and his left arm; headaches; Type II diabetes; CTS in both arms, hands, and legs; sleep apnea; vertigo; hearing loss; high blood pressure; severe depression; panic attacks; a history of multiple heart attacks; and hypertensive heart disease. (R. 1 at PageID.5-7). He also describes difficulty seeking continued treatment because of his lack of income. (*Id.* at PageID.6) ("I now have crap health insurance so I don't want to make any trips to hospital or cardiologist, I have no income and I am being sued by hospital for a heart cath I had a few years ago . . . ."); (R. 19 at PageID.616-17) ("My wife lost her house. We have lost almost everything we owned and we are living in my parent's basement. . . . [W]e have no money, we can barely afford food.").[2]

---

[2] Before drawing a negative inference from a claimant's failure to seek treatment consistently, the ALJ should consider any explanations the claimant may provide, or other information in the case record that explains the failure. SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996) (superseded by SSR 16-3p eff. Mar. 28, 2016). *See Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 (6th Cir. 2016). Though Plaintiff now puts forward his

Additionally, Plaintiff seeks to correct the record on various points—for example, though he told Dr. Nims he experienced no complications from diabetes, (Tr. 1195), he says his diabetes causes dizziness and foot issues, and sometimes makes him pass out, (R. 26 at PageID.1337). He also raises issues that he "[hadn't] even brought up to my doctor," such as a torn ACL in his left knee, torn tendons in his left hand, and a broken right thumb that had been pinned together and sometimes was so painful he could not use his right hand. (*Id.* at PageID.1340-41). Plaintiff also seeks a hearing to present the testimony of witnesses, including his doctors and wife. (R. 1 at PageID.7); (R. 26 at PageID.1342).

---

lack of finances as a reason he did not seek further treatment, he did not mention it to the ALJ, and there is not much in the record to suggest that cause to the ALJ. And when mention of Plaintiff's financial constraints does appear in the record, it is almost exclusively in relation to his testosterone shots. In a December 2013 letter, Plaintiff's wife, Leslie Duehring, submitted a letter explaining that Plaintiff was supposed to get a steroid shot for his thyroid condition every week, but he only received it every other week because he did not have enough money for gas to travel to the office every week. (R. 21 at PageID.944). Though in October 2014, Plaintiff explained to Dr. Thawani he was not taking Testosterone shots "because his insurance is not covering them and his wife lost her job." (*id.* at PageID.1170), by April 2015, Plaintiff seemed to be taking his Testosterone shots again, (*id.* at PageID.1171). Dr. Thawani noted that "[o]verall, the patient seems to be doing well." (*Id.*).

At the second hearing, Plaintiff said he had not been able to afford knee surgery because he had to pay child support, but he also acknowledged currently having medical insurance. (*Id.* at PageID.693). Lastly, when Plaintiff was discharged from physical therapy in August 2011, a formal physical re-evaluation was unavailable because Plaintiff was unable to continue his therapy due to "financial constraints associated with transportation." (R. 16 at PageID.270).

At bottom, I suggest the ALJ did not err in considering Plaintiff's sporadic treatment for complaints of pain in determining his credibility; further, even if this was error, I suggest remand is unnecessary because the ALJ presented multiple other reasons for not entirely crediting Plaintiff's account, (*id.* at PageID.646).

Defendant construes Plaintiff's motion as alleging error in the ALJ's (1) RFC assessment and (2) findings regarding his subjective complaints. (R. 23 at PageID.1308, n. 6). Defendant asserts that substantial evidence supports the ALJ's RFC assessment, emphasizing that "no medical provider opined that Plaintiff had specific functional limitations greater than those included in the ALJ's RFC assessment." (R. 23 at PageID.1310). The ALJ reviewed all the objective medical evidence related to Plaintiff's CTS, degenerative disc disease, osteoarthritis, left-sided sciatica, hypothyroidism, obstructive sleep apnea, obesity, and mental impairments, as well as his subjective complaints, before finding that Plaintiff's impairments were not as limiting as he had alleged. (*Id.*).

### 1. Whether Substantial Evidence Supports the RFC

First, I examine the ALJ's treatment of Plaintiff's physical impairments. Plaintiff's complaint, motion for summary judgment, and response touch on the following physical issues: herniated discs in his back; degenerative disc disease; pinched nerves; severe arthritis in his neck and back; numbness in both legs and his left arm; headaches; Type II diabetes; bilateral CTS; sleep apnea; vertigo; hearing loss; high blood pressure; a history of multiple heart attacks; hypertensive heart disease; and previous injuries to his left knee, left hand, and right thumb that still trouble him. *See generally* (R. 1, 19, 26).

The record in this case spans more than 1,200 pages, and the ALJ explores it in some detail. (R. 21 at PageID.640-47). I begin with a look at the ALJ's assignment of weight to the medical opinions in the record. Although two of Plaintiff's treating physicians provide brief medical opinions, neither speaks specifically to his RFC; the record also contains a

consultative physical examination, a consultative psychological examination, and opinions from two state agency examiners, as well as a letter from Plaintiff's wife.

Dr. Gary Roome, Plaintiff's prior primary care doctor, completed forms on July 25, 2012 and September 14, 2012 to discharge Plaintiff's student loans on the basis of disability. On the former, Dr. Roome wrote that Plaintiff's conditions were "mod severe" and he was "in too much pain to go to school or finish," (R. 21 at PageID.845); on the latter, he wrote that Plaintiff was limited in his ability to sit, stand, carry, bend, and lift, and in his activities of daily living, due to knee, back, and neck pain, and severe fatigue, (*id.* at PageID.1298). The ALJ reasonably assigned these opinions little weight, since they were years old and did not address specific limitations. (*Id.* at PageID.644). Further, as Defendant points out, though Plaintiff continually reported back pain to Dr. Roome, physical examinations at all seven appointments between June 2011 and July 2012 were unremarkable, with a normal range of motion all joints and normal sensation, reflexes, coordination, and muscle strength and tone. (R. 16 at PageID.300, 308, 325-36, 322, 350-51); (R. 21 at PageID.956, 960).

Dr. Caroline Mathew, Plaintiff's current primary care physician, penned a brusque note on June 16, 2016 that Plaintiff was "unable to work due to his diagnosis's [*sic*] of Hypertension, Palpitations and Lumbar Disc Disease." (R. 21 at PageID.922). She did not explain further. The ALJ, quite correctly, remarked that the determination of whether a claimant is disabled is reserved to the Commissioner, and treating source opinions on issues reserved to the Commissioner are not entitled to controlling weight. (R. 21 at PageID.644) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d); SSR 96-5p). The ALJ therefore gave little

26

weight to Dr. Mathew's opinion, also noting the dearth of specific physical limitations and Dr. Mathew's reliance on benign hypertension, which the ALJ supportably found non-severe, as explained below. (*Id.*). *See Cosma v. Comm'r of Soc. Sec.*, 652 F. App'x 310, 311 (6th Cir. 2016) ("The ALJ reasonably gave no weight to [the doctor's] opinion because her conclusion that [the plaintiff] is totally disabled is a determination reserved to the Commissioner."); *Johnson v. Comm'r of Soc. Sec.*, No. 13-CV-14797, 2015 WL 730094, at *34 (E.D. Mich. Feb. 19, 2015) ("Without any indication of these limitations, the opinion trenches upon the ultimate issue reserved to the Commissioner . . . and does not deserve any special significance." (internal quotations omitted)).

The ALJ gave partial weight to the opinion of Dr. Harold B. Nims, who performed a consultative physical examination on September 8, 2015. (R. 21 at PageID.1278). Plaintiff said his main problems were his knees and back pain, which radiated to both feet and was rated at 7 or 8 out of 10. (*Id.*). Further, he said, his entire left leg was numb, and his right leg was numb down to the right knee. (*Id.*). Plaintiff also said he had had seven myocardial infarctions in his life, though Dr. Nims observed that he "has a number of cardiology notes in his records, none of which refer to previous myocardial infarctions." (*Id.*). Next, Plaintiff gave "a somewhat vague history" of being diagnosed with Type II diabetes about two months earlier; he was being treated with metformin "but not well controlled," though he denied any complications from diabetes. (*Id.* at PageID.1279). He had also been diagnosed with chronic anxiety and depression. (*Id.*). He denied any problems with sitting, but said he could not stand for long periods due to back pain. (*Id.*).

On physical examination, he had a normal gait with the use of a cane. (*Id.* at PageID.1280). He was able to walk on his heels, walk on his toes, squat, and perform tandem gait without difficulty. (*Id.* at PageID.1281). He could stand on one leg at a time. (*Id.*). Straight-leg raising tests were negative, both sitting and supine. (*Id.*). Examination of his hands revealed no tenderness or atrophy and normal strength, and he was able to make a fist with both hands, write with his dominant hand, and pick up coins with either hand without difficulty. (*Id.*). A sensory examination of his right leg was essentially normal, while his left leg had some spotty areas of sensory loss. (*Id.* at PageID.1281-82).

Dr. Nims concluded: "The claimant's upper and lower extremities have normal function, strength and range of motion. The claimant does seem capable of most work-like activities without significant limits on his mobility. The claimant's ability to perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, carrying and traveling as well as pushing and pulling heavy objects is not impaired." (*Id.* at PageID.1282).

Finally, Dr. Nims laid out Plaintiff's physical limitations: Plaintiff could lift and carry up to 50 pounds occasionally and up to 20 pounds frequently; sit for 2 hours at a time and a total of 6 hours in an 8-hour workday; stand for 1 hour and a total of 3 hours in an 8-hour workday; walk for 30 minutes and a total of 3 hours in an 8-hour workday; never climb ladders or scaffolds or crawl; occasionally climb stairs and ramps, stoop, kneel, and crouch; occasionally tolerate exposure to humidity, wetness, dust, odors, fumes, and pulmonary irritants; frequently operate a motor vehicle; and tolerate frequent exposure to

vibrations. (*Id.* at PageID.1287-91). But he needed to avoid all exposure to unprotected heights, extreme cold, and extreme heat. (*Id.* at PageID.1291).

The ALJ assigned partial weight to Dr. Nims's opinion, explaining that the objective testing and examinations supported a limitation to light work, but that restrictions against exposure to humidity and pulmonary irritants "are not supported by the record and appear to be based upon the claimant's subjective reports of cardiac difficulties even though cardiac treatment notes were routinely benign with a normal catheterization and a normal ejection fraction." (*Id.* at PageID.645).

I suggest the ALJ sufficiently explained his reasoning. *See Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) (finding "treating physician [opinion] was not entitled to deference because it was based on Poe's subjective complaints, rather than objective medical data"). In fact, compared to Dr. Nims's assessment, the ALJ's ultimate RFC was more restrictive in that it limited Plaintiff to occasionally lifting up to 20 pounds (rather than frequent), and occasional overhead reaching (compared to no limitations), occasional pushing and pulling (same), frequent handling and fingering (same), no exposure to heights (same), and no exposure to vibrations (compared to frequent exposure). (*Id.* at PageID.640). Additionally, the ALJ prohibited Plaintiff from "even moderate use of hazardous moving machinery. (*Id.*).

On June 27, 2014, Dr. Quan Nguyen, a state agency examiner, also prepared a physical RFC for Plaintiff.[3] (R. 21 at PageID.679-81). In Dr. Nguyen's view, Plaintiff

---

[3] In an undated, handwritten letter included in the record, Plaintiff lays out several concerns about the ALJ's opinion. In relevant part, he says: "I want proof I seen Dr. Quan Nguyen

29

could lift or carry 20 pounds occasionally and 10 pounds frequently; stand or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; push or pull and use foot controls occasionally; occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; occasionally reach overhead; and frequently handle and finger. In addition, he would need to avoid all exposure to vibration and hazards. (*Id.* at PageID.681). The ALJ gave significant weight to Dr. Nguyen because his assessment was generally consistent with the medical record, and supported by Plaintiff's impairments of degenerative disc disease, osteoarthritis, carpal tunnel syndrome, sciatica, obstructive sleep apnea, obesity, and hypothyroidism. (*Id.* at PageID.646).

Now I will take a closer look at the record evidence, especially that upon which the ALJ depended. In terms of Plaintiff's heart function, the ALJ found Plaintiff's benign hypertension was not a severe impairment, explaining that Plaintiff took blood pressure medications as prescribed and routinely reported no complaints of high blood pressure, (R. 21 at PageID.983, 984, 990, 1203, 1205), his physician said his symptoms were controlled, (R. 21 at PageID.990) ("hypertension, controlled"), and a May 2014 heart catheterization revealed normal results, (R. 21 at PageID.1127-29). (R. 21 at PageID.637).

---

and Dr. Thomas T.L. Tsai in 2014. I have *never* seen them in my life." (R. 16 at PageID.589) (emphasis in original). To clarify, neither Dr. Nguyen and Dr. Tsai ever saw Plaintiff in person. Both are consultative physicians who reviewed the record at the request of the agency. As Social Security Ruling 96-6p explains, "[f]indings of fact made by State agency medical and psychological consultants . . . regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources" at the ALJ level. SSR 96-6p, 1996 WL 374180, at *1 (S.S.A. July 2, 1996).

As the ALJ acknowledged, Plaintiff has "a lengthy history of back and neck pain," as the ALJ acknowledged and thoroughly explored. (R. 21 at PageID.641-44). On June 29, 2011, lumbar spine imaging showed degenerative disc bulge spurs and degenerative disc disease at disease at L2-3, L4-5, L5-S1. (R. 21 at PageID.641-42) (citing R. 16 at PageID.276). There was a slight eccentric bulge L2-3 on the right, broad-based extruded disc at L5-S1 to the left extending into the neural foramen, and degenerative facet arthritis at L4-5 and L5-S1. (*Id.*).

In late 2011 and early 2012, Plaintiff saw orthopedist Dr. Hettle for his back pain that radiated into his left lower extremity. (R. 16 at PageID.317-19, 339, 366). Plaintiff tried physical therapy, and reported "significant improvement" in his leg symptoms after epidural steroids. (*Id.* at PageID.339). Dr. Hettle encouraged him to be "as active as possible." (*Id.*). But when Plaintiff continued to have pain after "extensive physical therapy" and three epidural steroid injections, Dr. Hettle recommended Plaintiff have a surgical consultation. (*Id.* at PageID.366).

A January 31, 2012 MRI of Plaintiff's cervical spine showed, at C4-C5 and C5-C6, small broad-based posterior disc osteophyte complexes mildly effacing the ventral thecal sac without causing cervical cord compression. (R. 16 at PageID.337).

In September 2014, Plaintiff saw Dr. Mathew for "recent onset" lumbar pain, which radiated to his foot and was accompanied by mild tingling and numbness. (R. 21 at PageID.1207). A straight-leg raising test was positive, and the range of motion in his back was somewhat limited due to pain. (*Id.*). He was assessed with left sciatica, for which Dr. Mathew prescribed pain medication, muscle relaxants, and back exercises, and

recommended Plaintiff consider physical therapy or a chiropractor if the pain persisted after a few days. (*Id.*).

A couple months later, in November 2014, Plaintiff saw pain management specialist Angel Rigueras for his continued low back pain, leg pain, and neck pain. (R. 21 at PageID.1130-34). She noted Plaintiff had decreased sensation along the L2, L3, and L4 and L5 dermatomes on the left, and an antalgic gait with decreased step length on the left and mild hip hiking on left. (*Id.*). Further she noted tenderness to palpation of the left L3-S1 paraspinal musculature. (*Id.*). Dr. Rigueras then set Plaintiff up for diagnostic left L3-L4, L4-L5, and L5-S1 facet joint injections. (*Id.* at PageID.1132).

In December 2014, Plaintiff reported the injections had helped "30 percent," but that his right-side pain was now at 10 out of 10. (R. 21 at PageID.1144). He said he had been depressed because his blood pressure had been "extremely high." (*Id.*). Dr. Rigueras noted significant tenderness to palpation at the right L3-S1 paraspinal musculature with positive facet loading to the right, and decreased tenderness to palpation on the left L3-S1 paraspinal musculature. (*Id.* at PageID.1146). She recommended Plaintiff continue his home exercise program and seek psychological counseling for depression, and administered a Toradol injection. (*Id.* at PageID.1147).

In January 2015, Plaintiff said the right lumbar facet injections had helped "at least 30%," but now he was experiencing neck pain and headaches severe enough to make him nauseated. (*Id.* at PageID.1177). Dr. Rigueras noted tenderness to palpitation at the left suboccipital region and right levator scapula, and administered a trigger point injection. (*Id.* at PageID.1177-78, 1180). In February 2015, Plaintiff said the left occipital nerve

block and right levator trigger point injection had helped "50%," but he was now having increased pain in his left lower back. (*Id.* at PageID.1182). The physician set him up for left upper sacroiliac joint and L4-L5 and L5-S1 facet joint block, and recommended Plaintiff talk to his primary care provider about Cymbalta. (*Id.* at PageID.1183).

In March 2015, Plaintiff told Dr. Rigueras that the facet joint block had helped 40%, and the Cymbalta had helped with his mood and pain, and he had not had any headaches since taking it. (*Id.* at PageID.1185). He had decreased tenderness to palpation at the left upper sacroiliac and L3-S1 paraspinal musculature. (*Id.*). A lumbar MRI that month showed: (1) At L5-S1, a moderate to large broad-based central to left paramedian disc herniation is effacing the ventral thecal sac, undersurface of the exiting left L5 nerve root and left S1 nerve root within its lateral recess; (2) at L4-L5, a moderate-size broad-based left paramedian to intraforaminal disc herniation was effacing the ventral thecal sac, undersurface of the exiting left L4 nerve root and left L5 nerve root within its lateral recess; and (3) at L2-L3, a small to moderate-size right paramedian to intraforaminal disc herniation was effacing the ventral thecal sac and right L3 nerve root within its lateral recess. (R. 21 at PageID.1200-01). An EMG showed evidence of L5-S1 nerve root irritation bilaterally. (*Id.* at PageID.1142).

Finally, in May 2015, as the ALJ noted, Plaintiff underwent lumbar facet rhizotomy treatment for his low back pain, followed by lumbar transforaminal epidural injections. (*Id.* at PageID.643) (citing *id.* at PageID.1195-98). The only indication that Plaintiff sought any treatment for his back pain after May 2015 is a July 2015 appointment with Dr. Mathew at which he complained of low back pain and leg numbness, and she mentioned seeing a

neurosurgeon. (*Id.* at PageID.1203-04). He said he would talk to his pain doctor and call if he decided to go with surgery. (*Id.*). There are no further records of treatment for Plaintiff's back pain, although he reported to consultative examiner Dr. Nims that his back was one of his main problems, (*id.* at PageID.1278), and to psychological consultative examiner D.r Goergen that most of his pain was in his back, and rated it at 8 to 10 out of 10, (*id.* at PageID.1262).

The ALJ explained at some length how he accounted for Plaintiff's impairments in the RFC, with particular emphasis on his pain and mobility issues. "Because of pain from degenerative disc disease, osteoarthritis, sciatica, rheumatoid arthritis, and chronic pain syndrome," he limited Plaintiff to standing for 3 hours, walking for 3 hours, and sitting for up to 6 hours in an 8-hour workday, with normal breaks. (R. 21 at PageID.647). Further, he limited Plaintiff to occasionally operating foot controls because of his lower back and osteoarthritis pain, and to occasionally reaching overhead because of his back pain generally. (*Id.*). His pain and restricted mobility prevented him from ever climbing ladders, ropes, or scaffolds, or crawling, and allowed him to only occasionally climb ramps or stairs, balance, stoop, kneel, or crouch. (*Id.*). Additionally, the RFC restricted him from any exposure to vibration and unprotected heights and even moderate use of hazardous moving machinery, in part because the ALJ expected that "restricted range of motion from pain . . . could preclude him from avoiding dangerous conditions." (*Id.*).

As for Plaintiff's CTS, an EMG study on January 24, 2012 revealed moderate carpal tunnel on the right and mild carpal tunnel on the left. (*Id.* at PageID.353). Tinel's sign was positive. (*Id.*). His reflexes were normal, and there was no weakness. (*Id.*). The ALJ noted

that Plaintiff had not needed or been recommended to have carpal tunnel release surgery. (R. 21 at PageID.646). As far as the record reveals, at the time the ALJ penned his decision, Plaintiff had not sought treatment for his CTS in several years. (*Id.*). *Strong*, 88 F. App'x at 846. And as Defendant observes, though Plaintiff mentioned his diagnosis at the first hearing, (R. 16 at PageID.97), he did not describe any functional limitations due to CTS. *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014) ("[D]isability is determined by the functional limitations imposed by a condition, not the mere diagnosis of it."). At the second hearing, he said he had numbness after writing for five minutes, and had no grip strength, but had never been prescribed braces or recommended surgery. (R. 21 at PageID.693). At the most recent hearing, he again mentioned CTS, (R. 16 at PageID.470), but did not describe any specific problems with manual dexterity or strength. In the end, the ALJ did take Plaintiff's CTS into account, he explained, by limiting Plaintiff to only occasional pushing or pulling and frequent bilateral handling and fingering. (R. 21 at PageID.647).

Turning to his sleep apnea, the ALJ summarized Plaintiff's April 12, 2012 sleep study, which he underwent due to complaints of excessive daytime sleepiness, loud snoring, episodes of apnea, and daytime tiredness. (R. 21 at PageID.974). The sleep study revealed a "minimal degree of sleep apnea associated with snoring." (*Id.*). Plaintiff was advised to switch to a non-sedating antidepressant medication, but he did "not need any specific intervention from a sleep apnea perspective." (*Id.* at PageID.974-75). A second sleep study, performed in September 2012, revealed "good control of sleep apnea with CPAP of 5 cm." (*Id.* at PageID.409). Plaintiff was started on CPAP and instructed not to

35

drive or operate heavy machinery while sleepy. (*Id.*). The ALJ accounted for his "excessive daytime sleepiness from obstructive sleep apnea," therefore, by including a limitation in his RFC to avoid all exposure to vibration and unprotected heights and even moderate use of hazardous moving machinery. (R. 21 at PageID.647).

The ALJ also noted that Plaintiff had treated with endocrinologist Dr. Hemant Thawani for several years for his hypothyroidism. (R. 21 at PageID.643), *see* (R. 16 at PageID.297, 312, 341, 375, 413; R. 21 at PageID.1017, 1170, 1171, 1237, 1239). Although in October 2014, Plaintiff had not been taking testosterone shots due to financial difficulties, (R. 21 at PageID.1170), at his most recent appointment, in April 16, 2015, Plaintiff was back to taking his testosterone shots and "seem[ed] to be doing well." (*Id.* at PageID.1171).

I turn now to Plaintiff's mental impairments. State agency consultant Dr. Thomas T.L. Tsai completed a psychiatric review of the record on June 26, 2014. (R. 21 at PageID.678). He found no medically determinable mental impairment prior to the date last insured, (*id.*); the ALJ acknowledged that at that time, there was no diagnosis of or treatment for mental impairments in the record, (*id.* at PageID.646). But the ALJ recognized that "[m]ore recent treatment notes support severe mental impairments of major depressive disorder, panic disorder, and social anxiety." (*Id.*).

Plaintiff had his first therapy appointment on December 16, 2014. (R. 21 at PageID.1164). He said he was always sad, cried a lot, felt helpless, was irritable, and had daily panic attacks, with sweating, dizziness, and a racing heart. (*Id.*). The therapist noted his appearance was neat and clean and he displayed appropriate behavior, stable motor,

rational conversation, normal thought control, intact memory, and adequate intellect, though also a guarded affect and "depressed/tearful" mood. (*Id.* at PageID.1166). Over the next seven or so sessions, and with medication, Plaintiff generally showed improvement. *See* (*id.* at PageID.1151-67). By his final session, on March 18, 2015, Plaintiff's mood was mildly depressed and anxious, but his coping skills had improved, his depression and anxiety had decreased, and he said, "I'm doing better." (*Id.* at PageID.1151). He was walking several times a week and spending time outside. (*Id.*). The record contains no further counseling sessions.

On August 25, 2016, Marianne Goergen, Psy.D., performed a consultative psychological examination of Plaintiff. (R. 21 at PageID.1262-66, 1274-76). Plaintiff said he had been having panic attacks daily before he took medication, though now the frequency and intensity had decreased. (*Id.* at PageID.1262). He was anxious in crowded settings and afraid to drive. (*Id.*). His symptoms of depression included feelings of irritability, hopelessness, and worthlessness. (*Id.*). Six months ago he had moved in with his parents, and he said his relationships with his wife and mother were "really good," though "not so much" with his father. (*Id.* at PageID.1263). He stayed close with his three children, who lived elsewhere, and his siblings. (*Id.*). He had "occasional contact" with friends, but did not like to leave the house. (*Id.*). And he got along well with his brother, who was also his neighbor. (*Id.*).

Plaintiff was casually dressed and adequately groomed, with an average level of eye contact, and he was pleasant. (*Id.* at PageID.1264). His thoughts were spontaneous, well-organized, and relevant to the topic. (*Id.*). Dr. Goergen's mental examination found he had

37

intact recent and remote memory, a good fund of knowledge, the ability to perform simple calculations, normal abstract thinking, and good judgment. (*Id.* at PageID.1265-66).

Ultimately, Dr. Georgen found Plaintiff would likely benefit from continued treatment with a therapist, and recommended tasks "be simplified, gradually increasing in complexity." (*Id.* at PageID.1266). She diagnosed him with Major Depressive Disorder (recurrent, mild); Panic Disorder; and Social Anxiety Disorder. (*Id.*).

Dr. Goergen found no limitations on Plaintiff's ability to understand, remember, and carry out instructions, (*id.* at PageID.1274), but marked limitations on his ability to interact appropriately with the public, supervisors, and coworkers, and to respond appropriately to usual work situations and to changes in a routine work setting, (*id.* at PageID.1275). She explained that Plaintiff suffered from anxiety in crowded settings, and a fear of being judged or criticized. (*Id.*). He was still having panic attacks, despite less contact with the public; his symptoms of panic included dizziness, sweating, and fear of having a heart attack. (*Id.*).

The ALJ gave partial weight to Dr. Goergen's opinion, agreeing that the record supported the diagnoses, which the ALJ also found to be severe impairments. (*Id.* at PageID.637, 645). He explained that Plaintiff's presentation at the examination and his testimony about social anxiety and panic attacks supported moderate limitations in his ability to understand, remember, and carry out instructions, rather than no limitations. (*Id.* at PageID.645). But he found that Dr. Goergen's opinion that Plaintiff had marked limitations in his ability to maintain social functioning was not supported by the medical evidence of record or the consultative examination itself, "as the mental status examination

38

was essentially normal with no indication of social difficulties in usual work situations." (*Id.* at PageID.645-46). The ALJ concluded that Dr. Goergen "appears to have placed too much reliance on the claimant's subjective complaints." (*Id.* at pageID.646).

Still, the ALJ accounted for Plaintiff's moderate limitations in understanding, remembering, or applying information; concentrating, persisting, and maintaining pace; and adapting or managing himself by restricting him to simple, routine, and repetitive tasks performed in a work environment free of fast-paced production requirements and involving only simple, work-related decisions and routine workplace changes. (R. 21 at PageID.647). And because of Plaintiff's moderate limitations interacting with others, the ALJ limited him to no interaction whatsoever with the public, and only occasional and superficial interaction with coworkers. (*Id.*).

In conclusion, for all the above reasons, I suggest the ALJ's RFC determination is supported by substantial evidence, and it should not be disturbed.

## 2. Plaintiff's Subjective Complaints

Previously, the court remanded this case because the ALJ failed to provide sufficient, satisfactory reasons for discounting Plaintiff's testimony. (R. 16 at PageID.530). In part, the ALJ put undue reliance on Plaintiff's "minimal and intermittent" daily activities, and mischaracterized them as "essentially typical." (*Id.* at PageID.532-33). Further, the ALJ misrepresented some of Plaintiff's course of treatment—for example, noting the Plaintiff's "physical impairments have improved with injections," though they had been effective only at relieving his lower leg pain, not his lower back pain. (*Id.* at PageID.533).

39

Plaintiff does not specifically address the ALJ's subjective symptom analysis in any of his letters, but Defendant submits that the ALJ properly found that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 21 at PageID.641).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); 16-3p, 2016 WL 1119029, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994).

The absence of objective, confirming evidence obligates the ALJ to consider the following factors: (1) daily activities; (2) the location, duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication; (5) treatments other than medication used for pain relief; and (6) any measure used to relieve pain. 20 C.F.R. § 404.1529(c)(3), 416.929(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); 16-3p, 2016 WL 1119029, at *7.

To begin, the ALJ laid out the two-step process for evaluating subjective complaints. (R. 21 at PageID.641). He then recounted Plaintiff's hearing testimony,

including that he had stopped working in June 2011, when his back pain became so bad he could not get out of bed. (*Id.*). The ALJ also made note of Plaintiff's daily activities: he occasionally took his sons to church activities, shopped for 30 minutes at a time with help, and did household chores a few times a week, but needed to take a 10-minute break every 15 minutes. (*Id.*). And he noted that Plaintiff rated his pain at an average of 7 out 10, with flares to 10 or 11 about three times a week. (*Id.*). In addition to back pain, he also had pain in his legs, neck, and arms, and arthritis pain throughout his body. (*Id.*). The ALJ also considered that Plaintiff took several medications for his pain, depression, panic, and anxiety, some of which caused nausea, and had also used medical marijuana three to four times daily for years. (*Id.*).

Next, the ALJ considered the medical evidence in the record, including (1) Plaintiff's treatment with Dr. Hettle and pain management specialist Dr. Rigueras, with physical examinations revealing, among other things, a decreased range of motion, decreased sensation, an antalgic gait, and positive straight leg raising tests, (R. 16 at PageID.317-19, 339, 366); (R. 21 at PageID.1172-1201); (2) some improvement with physical therapy, trigger point injections, and facet block injections, but also continued pain, (*id.*); (3) a May 2015 lumbar MRI showing disc herniation at L5-S1, L4-L5, and L2-L3, (*id.* at PageID.1200-01); (4) a March 2015 EMG study of the legs showing L5-S1 nerve root irritation bilaterally, (*id.* at PageID.1142); (5) his May 2015 lumbar spine rhizotomy for low back pain, and lumbar transforaminal epidural injections, (*id.* at PageID.1195-98); (6) the RFC assessments of Drs. Nguyen and Nims, (*id.* at PageID.646). (R. 21 at PageID.641-646).

41

Ultimately, the ALJ concluded that Plaintiff "treated only sporadically for his complaints of pain," did not follow through with surgical consultations[4] or seek more specialized treatment, and reported "good improvement with physical therapy and injection treatment." (*Id.* at PageID.646). Plaintiff routinely noted improvement of his mental symptoms with medication and counseling. (*Id.*). And he had never required carpal tunnel release surgery, nor was there evidence that he had been treated for carpal tunnel syndrome in years. (*Id.*). I would agree with Defendant that considering all the above, the ALJ presented good reasons for not wholly crediting Plaintiff's subjective complaints, and remand is not warranted on this basis.

### 3.  Plaintiff's Request for a Hearing

In his complaint, Plaintiff alludes to an expectation of a future hearing, saying, "I have 4 doctors that will testify!" (R. 1 at PageID.7). In his motion for summary judgment, he formalizes the request: "I request an opportunity to present my oral argument and would

---

[4] It is not entirely clear what surgical consultations the ALJ means, but I surmise he is most likely referring to Dr. Hettle's recommendation in February 2012 that Plaintiff have a surgical consultation for his back pain. (R. 16 at PageID.366) Though Plaintiff did eventually undergo a lumbar facet rhizotomy radiofrequency ablation, (R. 21 at PageID.1195), more than three years had passed, and the ablation appeared to be on the recommendation of Dr. Mathew, *see* (R. 21 at PageID.987). So far as the record shows, Plaintiff never returned to Dr. Hettle.

Additionally, at the hearing, Plaintiff testified that he still had knee pain because he had "ripped both my ACL's right in half, they're supposed to repair those, that was probably five years ago and I never did it. Kind of scared of surgeries." (R. 16 at PageID.97). Dr. Mathew's comment that she "told him about seeing neurosurgeon" also appears to be unresolved in the record. (R. 21 at PageID.1204). Perhaps relevant is Plaintiff's report to Dr. Nims that "his doctors have said they want to do surgery on his back but . . . his cardiologist will not allow it." (*Id.* at PageID.1278).

like a hearing, so I can call a few people to help in my case, like a couple doctors and my wife at least! I do know I have a right to a hearing! Maybe you can get the lack of information from my doctor that you say is vague." (R. 26 at PageID.1342).[5] Defendant does not acknowledge this request.

As explained in the Practice Guidelines for Social Security cases before me, which may be viewed on the Eastern District of Michigan's website, "[o]ral argument will not be held in these [*i.e.*, Social Security disability] cases." Magistrate Judge Patricia T. Morris, *Practice                                                                      Guidelines*, http://www.mied.uscourts.gov/index.cfm?pageFunction=chambers&judgeid=47 (follow "Practice Guidelines" hyperlink; then follow "Social Security" hyperlink). I do not believe it would be helpful to make an exception in this case. A judge may order submission and determination of a motion without hearing under Local Rule 7.1(f)(2), and I recommend doing so now. *See, e.g.*, *Darish v. Lincoln Nat'l Corp.*, No. 2:12-cv-14101, 2013 WL 12122071, at *1 (E.D. Mich. Oct. 28, 2013); *Logan v. Comm'r of Soc. Sec.*, No. 13-CV-12807, 2014 WL 2217235, at *1 (E.D. Mich. May 28, 2014)); *Napier v. Cnty of Washtenaw*, No. 11-CV-13057, 2013 WL 1395870, at *1, *1 n. 1 (E.D. Mich. Apr. 5, 2013); *Sanford v. Standard Fed. Bank*, No. 10-12052, 2011 WL 1657745, at *1 (E.D. Mich. May 2, 2011); *Fayad v. Sebelius*, 803 F.Supp.2d 699, 701 (E.D. Mich. 2011).

---

[5] Plaintiff's comment about "information from my doctor that you say is vague" seems to be referring to Defendant's note that consultative examiner Dr. Nims found *Plaintiff* was "a very vague historian," (R. 21 at PageID.1278)—that is, Plaintiff did not give a clear history of his impairments.

To the extent Plaintiff's request could be construed as a wish to present additional evidence, I suggest he has not justified remand on that ground. In the Sixth Circuit, where the Appeals Council denies a request to review the ALJ's decision, the record is considered closed at the ALJ level. *See Cline*, 96 F.3d at 148. The court can consider evidence submitted after the record was closed only to determine whether remand is warranted under the sixth sentence of 42 U.S.C. § 405(g). Sentence six provides for remand where the claimant presents (1) evidence that "is both 'new' and 'material,'" and (2) "good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Hollon ex. rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

Evidence is new only if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)). Plaintiff does not explain—and I see no reason—why the testimony of his doctors and wife could not have been presented at his administrative hearing, or what additional information they might offer that they did not have before.

Nor do I have any reason to think the evidence would be material—in other words, that there is "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Foster*, 279 F.3d at 357 (quoting *Sizemore v. Sec'y of Health & Human Servs.*, 865 F. 2d 709, 711 (6th Cir. 1988)). And finally, I note that to the extent Plaintiff seeks to show his condition has deteriorated after the decision, the proper remedy is not remand, but a new claim of

44

benefits. *Sizemore*, 865 F.3d at 712. For the above reasons, I do not see that remand is warranted under sentence six on the basis of the proffered testimony.

### H. Conclusion

For the reasons stated above, I suggest that substantial evidence supports the Commissioner's decision, and I therefore **RECOMMEND** that Plaintiff's Motion for Summary Judgment, (R. 19), be **DENIED**, the Commissioner's Motion for Summary Judgment, (R. 23), be **GRANTED**, and this case be **AFFIRMED.**

## III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: July 31, 2019                                          S/ PATRICIA T. MORRIS
                                                             Patricia T. Morris
                                                             United States Magistrate Judge